MONROE, C. J.
Defendant has appealed from a judgment awarding plaintiff $15,000 as damages for personal injuries sustained by her in alighting from one of its trains upon which she had been traveling as a passenger. Plaintiff has answered, praying that the award be increased to $25,000. The facts, as we find them disclosed by the evidence, are as follows: ,
Plaintiff, at the time that she received the injury complained of, was a widow 62 years old, who had for som'e years earned her living, say, $100 per month, by painting on china and in other occupations. In the early part of 1918, in order to be near one of her sons, who had been ordered into training at Camp Beauregard, near Alexandria, in this state, she came from her home in Indiana and was soon employed in social work among the soldiers, at first in entertaining the soldiers at the Y. M. C. A. clubs, then as assistant librarian, then as assistant hostess at the Hostess House, and then as hostess; her connection with the work having been continued after her son had been sent with his regiment to France, because she liked it. During the period of her employment she had occasion very frequently to travel between the camp and the city of Alexandria on what was known as the “shuttle train,” which had been established by defendant for that traffic, and the usual stopping place of which in Alexandria was upon an embankment, which rose som'e 17 feet above the level of the adjacent streets, and alongside of a platform 600 feet in length by 15 feet in width, which defendant had erected upon the embankment to facilitate passengers in getting on and off the train. The embankment was bisected by Third street, the surface of which was 17 feet below, and the chasm was crossed by a bridge, the sides, or girders, of which were composed of plates of iron, standing on edge rising 3 or 4 feet above the railroad track, and located about that distance from the track on either side. The roadbed, as it may be called (on the bridge) consisted of timbers laid transversely from girder to girder, upon which were imposed stringers, upon which, in turn, were laid cross-ties, upon the horizontal surfaces of the ends of which were superimposed a line of timbers intended, apparently, the better to hold the ties in position, and between that line and the girders there were open spaces measuring some 34 to 36 inches in width. It was expected of engineers bringing in trains from the camp that they would be careful to clear the bridge before stopping the trains, and, all the doors being left unfastened, ingress and egress was as common through the rear doors of the cars as through the front, and neither the conductor nor the one brakeman with whom the train was provided considered it any part of his duty to assist passengers on or off or to make any suggestions on that subject. The trains varied in length with the crowds, and it seems to have been left to the engineer of each train to calculate or guess whether, having from four to *619 nine cars behind him, the last one had cleared or was still resting on the bridge when he brought it to a stop; the testimony on that subject being to the effect that occasionally and casually a brakeman was seen to signal the engineér from the rear, but that that precaution never became a practice, and upon the occasion of the accident here in question, when,-it being Sunday, there were more passengers and more cars than usual, both the conductor and the brakeman were at the head of the train, both, as we understand from their testimony, in order to facilitate themselves in getting away in advance of the passengers, to whom they considered that they owed no further duty after the train stopped, it happened in this instance that the engineer missed hfs calculation, or his guess, and stopped the train in such a position that the rear platform and steps of the car projected beyond the station platform and over the bridge, and the steps led immediately down to the open space between the ends of the ties and the girder. Plaintiff had occupied a seat near the rear door of the rear car, because that car was assigned to officers and ladies and the seat was the only one that seemed available, and when the train arrived and the car stop>ped, which was well after dark, she naturally sought to make her exit by the rear door, as the most convenient. There is some conflict in the testimony as to how well the platform' and steps of the car were lighted, and our conclusion is that, while the ear platform was moderately well lighted, it is probable-that the steps were rather in the shadows. Be that as it may, there was a strong light thrown by a street lamp on the sidewalk under the bridge, and as nothing intervened between the sidewalk and the space into which plaintiff looked when she descended the steps, as she had no knowledge or suspicion that the car had stopped elsewhere than against the station platform where she had always known it to stop, and as her thoughts were concentrated upon getting off the car rather than upon the station platform, which she felt quite confident that she saw before her, she stepped off the last step and, instead of landing upon the platform, landed upon the street pavement 17 feet below. There was no negligence upon her part in descending the steps, as she testifies that she held on to the handrails on either side; nor was she negligent in stepping off, since she had the right to assume that the steps which defendant, by its action and inaction, invited her to descend, led to the station platform, which was a safe and easy landing, and not into a space the bottom of which was a stone pavement 17 feet below. She testifies that she was confident that she saw before her that which she expected to see, and the evidence satisfies us that, apart from her natural obsession as to the presence of the station platform, her mistaking the pavement for the platform was, under the circumstances, a natural and excusable error. It is well recognized in optics that the art of measuring distances by sight is largely an acquired one, and it is a matter within the common experience that in many instances where the distances are short and one has nothing by which to measure it is difficult, if not imp-ossible, to determine the distance of an object within the range of one’s vision. Standing a few feet back from an open window, for instance, through which nothing is to be seen but a blank wall, the distance of the wall from the window becomes very much a matter of guesswork; it may be practically filling the window, or it may be quite beyond reach. That plaintiff thought she saw the platform immediately before her there can be no doubt, since she so. testifies, and it will not be presumed that she intended to precipitate herself to what would have otherwise appeared to be, and came near being, certain death. That she had a psychological reason for thinking as she did has been shown. And her testimony to the effect that *621 she had a physical reason for so thinking at the time is corroborated by the testimony of two witnesses who were on the scene a few minutes after she had fallen, who then examined the place from which she fell, and who testify that the lighted pavement upon which she fell, seen from the steps of the car through the opening in the bridge, had the appearance of the floor of the station platform.
Thomas Martin, called by plaintiff, testified as follows:
“Q. What was the appearance of things to anybody descending those steps? A. Appeared just as if it was a platform, or concrete walk, from the lights in the street under the ^bridge. Q. You made that observation you say, standing on the step which she evidently descended? A. Tes, sir. * * * Q. What was the appearance of things as you looked down from the rear steps of the rear coach, in reference to whether there was or was not a platform beneath? A. It would appear that there was; I would have taken it that there was a walk going along there; the light made it appear so.”
J. C. Carbo, called by plaintiff:
“A. A person getting off the rear end wouldn’t hardly notice that there was an open space there. * * *
“Of course, if they had paid particular attention they would have noticed it, but just going in an ordinary way, they would not.”
Witnesses called by defendant, who had examined the position with a' view to being so called, .testified that they found no difficulty in recognizing the opening for what it was, and distinguishing it from the station platform. The difference between the witnesses and the plaintiff was that her mind was occupied with the business of getting safely down the steps and upon a platform, the existence of which she had no reason to question; while the witnesses having been forewarned of the nonexistence'of the platform and the existence of the open space, concentrated their attention upon the finding of reasons why the one could be distinguished from the other.
A few witnesses testified that the proper exit to use in leaving a railroad car is the front door, but they, and all the other witnesses who were questioned on that subject, agreed that on the “shuttle trains” the passengers used either the front or the rear doors, as suited their convenience; that there was no railway employé to assist at either; that both doors were left open and that no notices of any kind were given in regard to their use; and it is made plain from the testimony of defendant’s witnesses that the engineer disobeyed instructions, disappointed expectations, and committed an error in stopping the train in question before clearing the bridge. He was not called to the stand by defendant, and no reason was given for not calling him.
[1 ] Defendant’s obligations,'as a carrier, require that it shall carry its passengers safely, unless prevented by some act of God or vis major of man, and shall provide them with a safe place of exit; but, in this instance, though it provided the place, the place was unsafe, which was worse for the passenger than if no place had been provided, and defendant is liable, in damages, for the consequences to plaintiff, who, as a passenger, was thereby injured. Turner v. Vicksburg, S. & F. R. Co., 37 La. Ann. 648, 55 Am. Rep. 514; Le Blanc v. Sweet, 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303; Clerc v. Morgan’s La. & T. R. & S. S. Co., 107 La. 370, 31 South. 886, 90 Am. St. Rep. 319; Leveret v. Shreveport Belt R. Co., 110 La. 404, 34 South. 579; Lancon v. Morgan’s La. & T. R. & S. S. Co., 127 La. 1, 53 South. 365.
[2] It is shown that the bones of both of plaintiff’s wrists were so badly broken and dislocated that at the time of the trial, six months after the accident, she could not close either hand so as to get the ends of her fingers nearer than an inch and a half or two inches from her palms, and that she will probably never be able to lift as much as, or *623 more than, 15 pounds. There is a preponderance of evidence to the effect that she will never be able to resume her avocation of painting on china, though one expert expressed the more hopeful view that she might in time be able to do that work, but he does not specify the time, and her life expectation is shown to be 12.3 years. In addition to the injury to her wrists, plaintiff suffered a fracture of the jaw and had a number of her teeth knocked out, necessitating the extraction of the others; she was badly bruised in various places, and it was thought that two of her ribs were broken, but there is some doubt about that; she suffered a rupture of the drum of' one of her ears, and has lost her hearing in that ear; the index finger of one hand was dislocated and the bone protruded through the skin; there was a contusion of her hips and an injury of some sort to her back. She was laid up for several months, suffered a good deal, physically and mentally, and was subjected to considerable expense. Pier income for 12 years discounted at 5 per cent, would amount to $11,280.41. We do not find that $15,000 was an excessive allowance, but see no sufficient reason for increasing it.
The judgment appealed from is therefore
Affirmed.