[No. 28676. Department Two. November 25, 1942.]

JOSEPH G. JACKSON et al., Appellants, v. THE CITY OF SEATTLE, Respondent.[1]

[1]Reported in 131 P. (2d) 172.

506

*Allen, Hilen, Froude & DeGarmo,* for appellants.

*A. C. Van Soelen* and *John A. Logan,* for respondent.

DRIVER, J.—This is an appeal by the plaintiffs from a judgment entered on a verdict in a personal injury action in favor of defendant city. Appellants assign as error the giving of two instructions and the refusal of the trial court to give an instruction requested by them. The assignments raise two questions: First, was the evidence sufficient to take the issue of contributory negligence to the jury; and, second, did the evidence warrant the giving of an instruction on the theory of unvoidable accident.

These questions will be discussed in the order stated, and only so much of the evidence as is pertinent thereto will be reviewed.

In the city of Seattle, east-west east 55th street and north-south 33rd avenue northeast meet to form a "T" intersection, 33rd extending to the north, but not to

the south, of 55th. Along that portion of the southerly margin of east 55th street which forms the closed end of the intersection, there is a concrete curb of the usual type and a concrete sidewalk. The walk is separated from the curb by a grass-grown parking strip nineteen inches wide. South of the walk, there is another grass strip extending to the wire boundary line fence of Calvary cemetery. Several feet east of the intersection, a telephone pole stands in the parking strip.

Respondent city operates a municipal passenger bus system, and, on June 10, 1940, at about 4:30 p. m., appellant wife (henceforth she will be referred to as though she were the only appellant) was a passenger on one of its vehicles traveling east on 55th and approaching the intersection just described. She gave the usual signal, and the bus driver pulled over to the curb at the south side of the street and stopped to let her out. In the act of alighting, she stepped into a hole in the parking strip and fell, suffering the injuries for which she brought suit.

According to the undisputed testimony of appellant and two other witnesses, the bus did not have a regular stopping place at the intersection in question. Sometimes it stopped west of the telephone pole, at other times east of it; and, on some stops the pole would be opposite the center of the bus. One witness said it was a new route and the bus stops were not definitely located or marked until sometime after the accident. Appellant further testified:

"Well, I was in the front of the bus. I got off at the front entrance and stepping down from the bottom step I stepped onto the parking strip, which was heavy with grass and I stepped into a hole and fell flat on my face onto the concrete sidewalk. I had no way of catching myself. I was surprised and there was no way of helping myself in any way shape or form. I had a couple of packages in my hand. Q. What did you have

in your packages? A. I had some tarts,—the other I had a dozen eggs and a loaf of bread, but it was not a large loaf."

On cross-examination, appellant said:

"Q. Did the bus drive up any differently this time than any previous occasion? A. It drove up to the curbing right by the telephone post. I looked to see whether I could get down. It was too far over to step to the sidewalk, so I stepped to the parking strip. . . . Q. You knew that parking strip was there, did you not? A. Certainly. Q. As you stepped did you look? A. I did. I always do. Q. Did you see the hole there? A. I did not. Q. Did you ever see the hole? A. No, I would not have stepped into the hole if I saw it. Q. I am not arguing,—I am asking if you saw a hole, and if so, kindly describe it to the jury. A. I saw a place to step and I stepped in there. It was clover and heavy bunch grass. . . . Q. Did you avail yourself of the handholds in stepping off? A. I did that. Q. You didn't on this occasion? A. Yes. Q. You did and stepped down? A. When I let go I was on the bottom step. Q. Your packages were in one arm? A. All in one hand. Q. So you held with the other? A. Yes."

Appellant's account of the manner in which she got off the bus is not contradicted in any way, and the only testimony which could possibly have any bearing on the question of her contributory negligence was that of three firemen from a nearby fire station who, shortly after the accident, examined the parking strip at the place where appellant said she fell. One of them stated on direct examination:

"Q. Did you go across the street and make an examination of the situation and the pole? A. I did. Q. What did you find there, Mr. Hinkston? A. There was a couple of holes there and the *grass grew up around them.* I guess this one was three or four inches deep. The other was a small impression in the grass. Q. Were these holes east or west of the pole? A. West of the telephone pole. . . . Well, just west of the pole,—I would estimate it may be a foot away from the pole

was one hole. It looked like it had been a telephone pole taken out at some time and dirt had settled or a rock or something of that order. Then there was one a couple of feet from that *and the grass had grown around there pretty well.* That was a couple of inches or three inches deep, I should imagine. It is below the level of the ground." (Italics ours.)

On cross-examination, he testified:

"Q. The other hole, where was that with relation to the telephone pole? A. A couple of feet. Q. Was that a round depression in the grass? A. That is what I would interpret it. Q. Nothing gouged out manually by some one digging? A. I could not hardly say it was dug up by some one digging. There was a little depression full of grass."

Another fireman testified:

"Q. Did you examine conditions around the pole where she was standing? A. Yes, I went over there and saw the hole that was there. As a matter of fact, there was two holes there, *more or less covered by grass and weeds,* that had been made there, I don't know how. They were there. I could see they were holes. Q. How deep were those holes? A. I would say anywhere,—two or three,—one was deeper than the other. Maybe one was two or three inches and the other three or four inches deep." (Italics ours.)

The following is from the cross-examination of the witness:

"Q. The first hole, the one immediately west of the telephone pole was gouged out, plainly discernible by anybody looking? You could say that? A. *I could not say that.* This point,—*these dandelions they grow over and fill out. If you had pulled the weeds away,* possibly it could have been, but it was at the time things were a little bit green there." (Italics ours.)

The testimony of the third fireman is the chief reliance of respondent on the issue of contributory negligence. We quote from his direct examination as follows:

"Q. Did you observe the condition of the ground where this had occurred? . . . A. I saw a little depression about the shape of a saucer and about ten inches in diameter and about three inches deep,—not over three inches in the center. The way I could judge, that would be about four feet west of the telephone pole. I did not see another hole."

And, on cross-examination:

"Q. Mr. Douglas, this hole you noticed was a saucer shaped hole? A. Yes. Q. Was a depression of about three inches? A. Yes. Q. The circumference was about ten inches? A. Yes. Q. That was not a gouged out space? A. No, it was there,—it seemed like it was in that shape a long time. It was smooth, just saucer-shaped. Q. There was no grass growing in the gouged out spot? A. There was a little grass growing, but it was not very tall. *Q. As you stood at the far side of the grass or dirt could you see that hole? A. No, I could not.* Q. When you were immediately above it and looked down it was quite discernible? A. You could look at the place and you could see it easily." (Italics ours.)

As the foregoing is the testimony respondent particularly stresses on the question under consideration, it should be carefully considered and closely analyzed. All the witnesses agreed that there was more or less grass growing on the parking strip and in the holes. When respondent's attorney asked Mr. Douglas if, when he stood *"at the far side of the grass or dirt,"* he could see the hole, the witness replied, *"No, I could not."* (Italics ours.)

The parking strip was nineteen inches wide. The hole in question was approximately in the center of the parking strip. The "far side of the grass or dirt," as respondent's counsel put it, either at the curb or at the sidewalk which marked the opposite margins of the parking strip, could have been no more than a few inches from the hole. Hence, the import of the testimony was that, when the witness stood at the edge of

the parking strip, a position relatively more favorable than was appellant's when she stepped down from the bus, *he could not see the hole.* It was only when he was immediately above it and, knowing it was there, directed his attention to it that he could see it.

Although respondent does not contend that there was a failure of proof of negligence on its part, we think it may be helpful to state briefly some general principles governing the duty of care of both parties under the circumstances of the present case.

As a common carrier, respondent was required to exercise the same high degree of care for passengers boarding or alighting from its vehicles as it owed with reference to their transportation. 13 C. J. S. 1352, § 723. It was respondent's duty to select a safe place to stop its vehicle, whether it was the usual stopping place or not, if it was one at which a passenger was expressly or impliedly invited to alight. *Davis v. Kelly,* 152 Ark. 151, 237 S. W. 698; *Locke v. Ford,* 54 Ga. App. 322, 187 S. E. 715; *Hamilton v. Louisiana R. & Nav. Co.,* 147 La. 616, 85 So. 611; *Gott v. Kansas City Rys. Co.,* 222 S. W. (Mo.) 827; *Muskogee Electric Traction Co. v. Latty,* 77 Okla. 156, 187 Pac. 491; *O'Malley v. Laurel Line Bus Co.,* 311 Pa. 251, 166 Atl. 868.

As a passenger alighting from a common carrier, appellant was obliged to exercise only ordinary or reasonable care for her own safety. 10 Am. Jur. 309, § 1530. A passenger has the right to assume that a place at which a carrier's car stops is a reasonably safe place to board or alight unless it is obviously dangerous. *Mobile Light & R. Co. v. Walsh,* 146 Ala. 295, 40 So. 560; *McGovern v. Interurban R. Co.,* 136 Iowa 13, 111 N. W. 412, 13 L. R. A. (N. S.) 476, 125 Am. St. 215; annotation, 32 L. R. A. (N. S.) 881, 884.

Contributory negligence is an affirmative defense, and the burden of proving it rested upon respon-

dent. That issue should not have been submitted to the jury unless there was substantial evidence that appellant's own negligence proximately contributed to her injury or evidence from which such negligence on her part could reasonably be inferred. It was not appellant's duty to scrutinize searchingly the ground on which she was about to step in alighting from respondent's bus. She had the right to assume that the carrier was discharging her at a reasonably safe place, and it was not negligence on her part to act upon that assumption unless the danger was so open and obvious as to challenge the attention of a reasonably prudent person similarly situated. The hole into which she stepped was grass grown and constituted a hidden danger, not an open, obvious one. It affirmatively appears from the record that a witness, when he stood at the edge of the parking strip and somewhat nearer to it than was appellant when she alighted from the lowest step of the bus, could not see the hole.

Respondent adduced no substantial evidence that appellant, exercising reasonable care for her own safety, should have seen the hole, and the question of contributory negligence should not have been submitted to the jury.

Passing now to the second question presented, the instruction of the trial court which appellant contends should not have been given for the reason that there was no evidence to support it, reads as follows:

"The court instructs the jury that if the plaintiff's [appellant's] injuries were the result of a pure accident, such as could not be ordinarily anticipated, and not the negligence of either the plaintiffs or the defendant, then the plaintiffs cannot recover."

The operator of respondent's bus testified on cross-examination:

"Q. Your impression was that you had passed the pole before you stopped? A. I had passed the pole.

Q. Then,—the poles,—the pole has been identified as 'A' and then, according to your testimony, the place where she got off was to the east of the pole?   A. I could not say for certain.   As I remember, I passed the pole."

Thus, the operator said he stopped the bus *east* of the telephone pole.   There was no hole in the parking strip on that side of the pole, nor does the record indicate that there was any other unusual condition there that could have caused appellant to fall.   The jury had the right to believe the bus driver's testimony— hence could have concluded that appellant's injuries resulted from some mischance without negligence either on her part or on the part of the respondent.

An accident may be inevitable in that it resulted without human agency and by so-called "act of God." But the term "unavoidable accident," in a more restricted sense, means an accident that could not have been prevented by the exercise of due care on the part of the human actors involved.   This court approved the giving of an instruction employing the term in this narrower sense in *Hayes v. Staples,* 129 Wash. 436, 225 Pac. 417, although, it should be noted, the circumstances in that case were quite different from those of the case at bar.   So employed, "unavoidable accident" has been defined as meaning an accident which cannot be avoided by that degree of prudence, foresight, care, and caution which the law requires of every one under the circumstances of the particular case, which is not occasioned in any degree, either remotely or directly, by the want of such care and skill as the law holds every man bound to exercise, or which occurs without fault attributable to any one.   And, in this sense, it has been held to be equivalent to, or synonymous with, "mere accident" or "pure accident." 1 C. J. S. 443, 444.

In other jurisdictions, it has been held that an unavoidable accident instruction may properly be given where the evidence is such as to support a finding by the jury that there was no negligence on the part of either the plaintiff or the defendant. In *Sitkei v. Ralphs Grocery Co.*, 25 Cal. App. (2d) 294, 296, 77 P. (2d) 311, the question arose as to whether the trial court committed prejudicial error in instructing the jury as follows: "'An unavoidable accident is one which occurs without fault or negligence upon the part of any of the parties thereto.'" The court held that the instruction was proper. Accord: *Lehnerts v. Otis Elevator Co.*, 256 S. W. (Mo.) 819.

It is our conclusion that the trial court did not err in giving an instruction on the theory of unavoidable accident.

Reversed and remanded, with direction to grant appellant a new trial.

ROBINSON, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.