[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 134 
This is a tort action in which Raymond L. Weadock sues to recover damages for physical injuries, etc., sustained by him in and resulting from a mid-air collision over the field of the Shreveport, Louisiana, Municipal Airport, between a Piper Cub plane operated by him, and a Funk 75 plane operated by Walton Greer. Newton B. Badgett, operating as Badgett Flying School, and sixteen different casualty and indemnity insurance companies, who insured him and the Civil Aeronautics Authority of the United States Government (hereinafter referred to as the CAA), against damages imposed by law, arising from the training of student pilots, etc., as hereinafter described, were impleaded as defendants.
When the accident occurred Raymond L. Weadock was a minor. He attained majority prior to date this suit was filed, and, therefore, in so far as concerns his claim for damages, petitioned in his own right. His father, Leo H. Weadock, joins in the suit as plaintiff and sues the same defendants to recover amounts necessarily expended by him during the son's minority to alleviate his pain and suffering and for treatment of physical conditions resulting from the collision.
The pertinent background history and facts preceding the accident are succinctly stated in brief of appellees' counsel, to-wit:
"Sometime prior to November 18, 1940, the CAA inaugurated what is referred to as the `Civilian Pilots Training Program', the purpose of which is to train civilians — under-graduate collegians — for prospective pilots in the United States Army Air Corps. To effectuate this program, the CAA entered into written contracts with various civil flight contractors throughout the Nation. On October 2, 1940, Newton B. Badgett obtained such a contract, under the terms of which he was to give certain specified courses in ground and flight training to students of Centenary College at the rate of $335.00 per student (Vol. 4, R 770-782).
"On October 3, 1940, petitioner, Raymond L. Weadock, then a Junior Student at Centenary College, enrolled for such training course and pledged himself to join the United States Army Air Corps if accepted *Page 135 
and upon the successful completion of the course (Vol. 1, R 21). Young Weadock reported to the defendant's school, operating at the Shreveport Municipal Airport, on October 8th, 1940, and was assigned to Instructor Elmer Lane, Badgett's employee."
The training course for student pilots consists of four grades or stages, A, B, C, and D. Ground instruction is given at Centenary College in the City of Shreveport, whereas actual flying is mainly done and taught at the airport by licensed instructors. Both phases of instruction are given simultaneously.
Young Weadock successfully met all the requirements of grades A and B and from examination was found competent to be, and was being instructed in grade C when injured. To that time he had had fourteen and one-half hours of flying experience of which three hours and thirty minutes or seven flights represented solo flying; that is, flying without being accompanied by an instructor.
At the hour of 2:30 o'clock p.m. November 18, 1940, young Weadock reported at the airport for instruction. He was directed by Mr. Lane, his instructor, to get into the Piper Cub plane and occupy the rear seat thereof preliminary to making a routine solo flight. This being done, Weadock was strapped to the plane as was the custom. At this moment Mr. Lane was called to the Administration Building hard by to answer a telephone call. The plane was taxied northerly about one-third of a mile to or near the north boundary of the field. Lane instructed Weadock, as he had done previously, to carefully survey the air in all directions prior to taking off to ascertain if it were safe to do so; that is, to learn by observation if there were any planes in sight that would jeopardize the safety of the contemplated flight. Prior to beginning the routine flight, he executed a right turn of one hundred eighty degrees which was effected by making a ninety degree turn toward the east and another southerly. This done, the plane faced into an eleven mile per hour wind. Flight was then begun by giving the plane the needed power to ascend. When approximately one hundred fifty feet high and near the center of the field, the accident occurred.
Unknown to Lane or Weadock, Walter Greer, a trainee of the Stovall Training School, competitor of the Badgett School, also using the facilities of the airport, had, at a time prior, but not fixed by the record, made a take-off, and was then in the process of executing a maneuver known as the three hundred sixty degree "spot" or precision landing, simulating a plane in distress. This maneuver is performed by a take-off from or above the north boundary of the airport and passing over a spot or imaginary line near the center of the field, at an altitude of approximately one thousand feet, immediately after which the motor is throttled, the plane begins to glide, gradually descends, and at undetermined distances, in succession, two one hundred thirty-five degree left turns are made, followed by a ninety degree turn to the left. The plane is then facing southerly, still losing momentum and is supposed to be about one thousand feet north of the north boundary of the field. The objective of this maneuver is to effect a safe landing at the spot or on the imaginary line near the center of the field or not more than three hundred feet beyond. It is an important phase of the training course of each student and is designed to test his ability to control and successfully ground a plane simulating distress from motor or other mechanical trouble. Necessarily, the pilot, to successfully execute this maneuver, is not required to observe nor follow fixed rules governing flights under normal conditions. If his ability to successfully perform the maneuver is demonstrated by test, he is entitled to a pilot's license.
Greer's whereabouts when he completed the ninety degree turn of the three hundred sixty degree maneuver is an embattled issue in the case. At all times he was at a higher altitude and was moving at a much greater speed than Weadock, after his take-off. He was thereafter descending whereas Weadock was ascending. The left wing of Greer's plane struck the body of Weadock's. Greer successfully grounded his plane but Weadock, possibly due to inexperience, failed to successfully ground his. He lost control and the plane dashed to the ground, causing the injuries alleged upon.
Concerning the physical condition of the airport and the amount and character of air traffic thereon, etc., at time of the accident, plaintiffs alleged, as was true: "* * * was rated as a fourth grade airport and had no runways or restricted areas for landing or taking off, although two or more schools were then *Page 136 
engaged in giving flight training to more than seventy students, in addition to a general and indiscriminate use of said airport by the flying public at large."
Plaintiffs' suit originally was predicated upon various alleged acts of negligence charged to Badgett and his school while training and instructing young Weadock. However, the record clearly indicates, in fact, appellees virtually concede that but two of these charges of negligence are seriously relied upon for a recovery. These are given in brief of appellees' counsel, as follows:
 "Point I
"In directing a preliminary flight trainee to take off, in the initial stages of his training, in solo flight, from an airport at a time when regulations governing contact flight had been dispensed with as to craft already in the air; and performing dangerous training maneuvers above such airport without warning the student of such condition, is actionable negligence; and
 "Point II
"It is negligence to permit a flight trainee, in the initial stages of his solo flying, to take off from a busy airport accommodating commercial and private flying, together with two competitive flying schools, training inexperienced prospective aviators, without some character of flight supervision or control."
Defendants deny each of the alleged acts of negligence, and expressly aver freedom therefrom on the part of Badgett or his school or their agents, as the cause or contributing cause of the accident. Further answering, they allege that the collision was due to the manner in which young Weadock was at the time operating his plane and, also, to the negligence and lack of care of Walton Greer; that young Weadock, in keeping with the rules and regulations, had been taught and warned to make careful scrutiny of the air and flying conditions above the field before taking off to ascertain if it were safe to do so, and had he followed these instructions the collision would not have occurred. Further, in defense, defendants plead as follows:
"Further answering, shows that said Weadock took off for his flight and continued the same when there was risk of collision with another plane, and without giving the right of way to landing aircraft, all in violation of the Civil Air regulations; and that, although he should have maintained at all times a proper lookout ahead, he did not do so; and that at the time of the collision and prior thereto, he was operating his plane in a negligent, careless and dangerous manner.
"Further answering, shows that said Weadock, in enrolling as a student pilot at Centenary College and at the Badgett Flying School, and in proceeding with the course of training and instruction offered by these schools, assumed all of the risks and hazards involved in said course, including those incident to the flight which he was making at the time of the collision, and including, of course, the risks and hazards resulting from his own negligence."
In the alternative, contributory negligence of Raymond L. Weadock, as a bar to recovery by either plaintiff, is pleaded.
At plaintiffs' instance the case was tried with intervention of a jury. Verdicts were rendered as follows: for Leo H. Weadock, $1,403.32; Raymond L. Weadock, $42,952, being the exact amounts for which sued. After unsuccessful effort for new trial, all defendants appealed.
We shall consider and dispose of the above-quoted charges of negligence in inverse order. Reduced to its essence the second charge is: That it was actionable negligence or negligence of such gravity as to constitute and be the or a proximate cause of the accident to instruct and train prospective pilots at the Shreveport Municipal Airport "without some character of flight supervision or control."
This airport is owned by the City of Shreveport and is administered by it through the Department of Streets and Parks. In conjunction with the Administration Building there was erected a control tower, but to the time of the accident no system of control had been set up. None could have been instituted except by the city or with its permission and the approval of the CAA. Any such system has to be operated and directed by a person deemed competent by the CAA and who holds a license as such from that authority.
The functions of a control system, such as are here discussed, are to assist in directing and controlling incoming and departing traffic for the purpose of preventing or reducing, as far as possible, accidents from collision. Such a system may consist of radios, lights or other *Page 137 
visible signals. Of course, the use of radios in such a system would be of no service except to planes likewise equipped.
The testimony of several experts in the science of aeronautics is in the record. Each was interrogated at length in regard to control systems at airports of which they had knowledge, their importance, degree of effectiveness, and desirability. It appears from this testimony that few, if any, airports of the class and grade of that owned by the City of Shreveport, at time of the accident, were equipped with a control system of any character. The institution of such a system anywhere had not been made compulsory by the CAA in its general regulations, although recommended by it.
The amount and character of traffic at an airport are the controlling factors in determining whether the institution of a control system is imperative as a safety measure. At the time of the accident traffic at the Shreveport Airport had not reached proportions deemed sufficient to require the system.
It also appears that the CAA approved the conduct of Badgett's school without requiring that a control system of any character be installed as a prerequisite of the acceptance of his students into the air service of the United States, nor as a prerequisite of payment to him of any funds made available by Congressional appropriation for such a school. The facilities of the airport were availed of "as is" by both schools. The city was not requested by anyone to install the system.
Here, it is apropos to state that this is the first mid-air accident at this airport since its erection some twelve years ago. There have occurred ground accidents of minor consequence. These are inevitable under any system.
It is shown that the operation of a control system regardless of character does not entirely make impossible accidents in the air or on the ground. Such do occasionally occur under the most excellent control system; for instance, at Barksdale Field and at Fort Worth. Ofttimes over fields congested by the presence of many planes of various kinds, visible signals create confusion rather than aid in the directing and control of traffic. It does not certainly appear that had there been any signaling device in operation at the airport the accident herein involved would not have happened.
Training schools of the character conducted by Badgett were instituted over the country generally during 1939 and 1940, at which candidates for pilot's license were given training without regard to control systems. Had existence of such systems been a condition precedent to CAA approval and assistance, doubtless the number of young men who volunteered for or were assigned to such service, would have been materially less than was, and, as a consequence, attainment of adequate air force to defend the nation in its hour of peril, unreasonably delayed.
We are of the opinion, all things considered, that it was not negligence on Badgett's part to conduct the training school in the absence of a control system of some sort. He could not have instituted such a system himself without the city's consent, with the CAA's approval, and the fact that he did not request the city to do so created against him no inference of negligence.
Should it be conceded arguendo that the failure of Badgett to install or have installed a control system of some character at the airport prior to conducting his school thereat, we think young Weadock, who had full knowledge of this fact, assumed the risks obvious and patent, incident thereto. He had been flying for a period of some six weeks. He had made seven solo flights successfully and evidently had faith in his ability to complete all the grades without the aid of a control system. He was willing to and did freely undertake achieving his laudable ambition under the hazardous conditions as he found them to exist when he made his first flight. Having acted with his "eyes open" he cannot now be heard to complain.
In support of this conclusion we quote from American Jurisprudence, as follows:
"While the courts frequently state as a broad general rule that a servant never assumes the risk of the master's negligence, according to the great weight of authority, this rule is subject to an exception or limitation where the servant continues in the service with knowledge of the employer's negligence and with an appreciation of the danger involved. At common law as administered by the courts of must jurisdictions, an employee is deemed to assume *Page 138 
the risk of his employer's negligence when, with knowledge of the fact of such negligence, actual or constructive, and with appreciation of the danger therefrom, he continues in the employment without complaint and without promise on the part of the employer to repair or discontinue such negligence, and he is by reason of such assumption of risk precluded from holding the employer liable for injuries received as a proximate consequence of the danger which the employer's negligence created or allowed to exist.
* * * * * *
"Primarily, the employer is bound to provide for the safety of his employees, and the employees have a right to rely upon the performance of this duty. They are not barred of recovery for injuries — or, in the terminology of the present topic, they do not `assume the risk' — occasioned by the failure of the employer to perform his primary duty, unless they have actual or constructive knowledge of the dereliction and of the perils arising therefrom, and continue in the employment without protest; but if they do have knowledge thereof, a recovery is not sustainable under the common law."
The following cases likewise sustain this view: Daly v. Kiel,106 La. 170, 30 So. 254; Ingham v. John B. Honor Company,113 La. 1040, 37 So. 963; Chevallier v. J.F. Ball Bros. Lumber Company, Ltd., 141 La. 943, 75 So. 1001.
The remaining charge of negligence, reduced to its essence, consists of allowing and instructing Weadock to take off in solo flight when Greer was in the air performing a dangerous training maneuver, without informing Weadock of that fact.
We are told by attorneys of each side that after diligent research no precedent to this case has been found. We know of none. Cases have been adjudicated wherein damages for injuries received by persons traveling in planes were sued for, but not one of these cases arose from a collision in mid-air. This being true, and there being no authoritative work, to our knowledge, that treats of the duties and obligations of instructors in aeronautics to provide guidance, the field, as it were, being uncharted, resort to legal principles governing other kinds of cases will be made in the hope of correctly adjudicating the issues here tendered. This course will have to be followed by courts generally until there has been adopted by proper authority a system of rules and regulations peculiar to the subject.
Since there was no system of control of any character at the airport to aid the trainee students in taking off and landing their planes, the question necessarily arises: What was the measure or standard of duty due by Badgett and his instructors to trainees to protect them against accident?
It goes without saying that air navigation is an exceedingly hazardous enterprise and it seems to us that when no control system is relied upon for the guidance and protection of trainees, every other possible precaution against the constant possibility of accident should be required of those who, for pay, assume to instruct the unlearned in this enticing science.
The relation of teacher or instructor and pupil existed between Badgett and young Weadock, which arose from contract. We do not know of any independent treatise or set of rules designed to govern such relationship, particularly with reference to tortious acts of the teacher committed while instructing a student. It is suggested by counsel for appellees that the law of apprenticeship might be applicable. We are unable to agree with this theory. The facts of the relationship are such, we think, to make applicable in a general way, the rules and legal principles governing the relationship of master and servant; and on this theory we shall undertake to determine the respective rights of the litigants as propounded by the above-stated proposition of negligence.
Anyway, if liability exists, it is because of some act or acts of omission or commission by the instructor, tortious in its or their nature, amounting to negligence, constituting the proximate cause of the accident.
Tort has been defined many times. Tersely stated, it is a breach of a legal duty. The fundamental basis of the general law of tort in this state is found in the first paragraph of Article No. 2315 of the Civil Code and reads as follows: "Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it; * * *".
Every tort action embraces three distinct elements, viz.: *Page 139 
1. Existence of legal duty from defendant to plaintiff;
2. Breach of that duty; and
3. Damage as a proximate result.
In Prescott et al. v. Central Contracting Company et al.,162 La. 885, 111 So. 269, 270, the court defines negligence to be: "The violation or disregard of some duty."
When young Weadock enrolled as a student in Badgett's school, he was without any experience whatever in flying. He submitted himself unreservedly for instruction and, perforce, looked to his instructor for guidance and direction in pursuing the hazardous business he wished to master. He made no movement nor performed any act whatever during the few weeks he was in training except under the eye of his instructor or in strict keeping with his directions. In total subserviency of the student to the instructor and regard for him as master of all things appertaining to the course, the case was complete. Implicit reliance upon the instructor's superior knowledge, flying experience and prudence in all matters concerning the training, were evident. Therefore, when Lane directed Weadock to make the routine flight which ended in near tragedy, Weadock assumed, as he had a right to do, that conditions were favorable for such a flight.
Lane testified that he was unaware that Greer had taken off and was at the time he instructed Weadock to make a flight, making the "spot" or precision maneuver, conceded by all to be difficult of execution by an immature trainee and exceedingly hazardous; so much so that Badgett did not use the field for that maneuver; he required his students to make this maneuver over pastures and meadows some miles from the airport.
It was Lane's duty and obligation as the agent of Badgett to have known that Greer had just taken off and the nature of his flight. He was then at the airport in the discharge of his duties to Badgett, and was charged with the highest degree of care and precaution to the end that his students be not exposed to dangers which by the exercise of even reasonable diligence could be avoided. Why he was ignorant of Greer's flight is difficult to understand as Greer's movements were then being critically observed by one Lake Littlejohn, an inspector of the CAA who was either on the field near the Administration Building or in some part of the building affording visibility over the field to the east. Lane and Weadock departed from this building immediately prior to Weadock taxiing off. Had Weadock been advised of true conditions, and not been left to assume that it was safe for him to make the flight, as he did, we are confident the accident would not have occurred.
The facts of this case, we are convinced, warrant application of the rule of imputation of knowledge. Lane should have known, and by the exercise of ordinary care could have known, that Greer was making a hazardous test maneuver. In legal contemplation he is held to have known it.
There was no co-operation whatever between representatives of the two training schools. Rivalry between them appears to have been so keen that co-operation as a measure of safety was entirely overlooked. Some sort of public posting of departure and return of all training planes should have been maintained. Had such a practice been in force instructors and trainees could have kept themselves well advised as to air conditions over and about the field. The city could have seen to it that adoption and observance of such a rule was made a condition to use of the airport for training purposes.
It is axiomatic, as a legal principle, that in the undertakings of life, the greater the hazard involved the greater the degree of care and prudence on the part of those who choose to conduct such undertakings. Persons engaged in the manufacture, sale and distribution of electricity are held to the highest degree of care and caution in doing so because of the violent and dangerous character of such agency.
Anent this question 38 American Jurisprudence, 677, 678, § 3 says: "Generally speaking, the degree of care required of one is graduated according to the danger attendant upon the activity which he pursues or the instrumentality which he uses. The greater the danger the greater the degree of care which is required. Necessarily, a higher degree of care and vigilance is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involve little or no risk of injury to persons or property. No less a degree of care than that commensurate with the apparent danger, *Page 140 
or in proportion to the danger reasonably to be anticipated, is reasonable. As often said, the more imminent the danger, the higher the degree of care. Clearly, when human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense."
The principle so cogently discussed in this quotation was followed by the Supreme Court in Prescott v. Central Contracting Company, supra, and in many other cases.
We can perceive of no valid reason for not holding that the same strict rule governing the duties of those engaged in the manufacture, sale and distribution of electricity should not apply with equal force to those who, for pay, engage in training young men in the science of aeronautics. Therefore, we hold that Lane's negligence in the respects herein discussed was actionable and constitutes the proximate cause of the accident.
Appellants seriously urge that Weadock assumed all risks incident to the training he was receiving through Badgett's school, including that of collision in mid-air. We do not think this plea well founded in view of the facts of the case.
An illuminating discussion of the doctrine of "assumption of risks" is to be found in § 301, Volume 35, American Jurisprudence, 725 et seq. We quote a pertinent portion of this section, to-wit: "The dangers which an employee may incur in any employment fall naturally into two classes: (1) The ordinary risks of the service, — those which are not created by negligence or breach of duty on the part of the employer; and (2) those risks which are created by the employer's negligence, or extraordinary risks. It is universally recognized that an employee by his very contract of employment assumes the ordinary risks of the service, and if he is injured solely because of them, he cannot recover from his employer, but there has been much comment upon, and not a little confusion concerning, the question whether the employee `assumes the risk of the employer's negligence.' A note of indefiniteness is noticeable in many of the expressions; and some statements are quite unintelligible. It is often asserted without qualification that the employee does not assume the risk of the employer's negligence. As is aptly said, carelessness or negligence of the employer is not `incident' to the employment or is not one of the `ordinary' risks thereof. The `assumption of risks' by virtue merely of the contract of employment does not, according to the generally accepted rule, extend beyond the `ordinary' risks of the employment, so that an employee does not, merely by entering the employment, assume the extraordinary risks created by the master's negligence."
It is seen from this quotation that the general rule is the servant assumes all ordinary risks of his employment but does not assume risks of an extraordinary character nor those arising from the master's own negligence, unless they be obvious or patent or of which the servant has knowledge. This is also the law of this state as enunciated in several decisions of the Supreme Court, including these: Burns et ux. v. Ruddock-Orleans Cypress Company,114 La. 247, 38 So. 157; Rochelle v. White Castle Lumber 
Shingle Company, Ltd., 120 La. 588, 45 So. 449, and cases cited therein; Wirth v. Alex Dussel Iron Works, 140 La. 1056, 74 So. 551.
Supporting the plea of contributory negligence appellants argue that in taking off when and where he did, Weadock violated regulations of the CAA which were being observed at the airport and taught to all prospective pilots; and, in addition, saw or should have seen the Greer plane while he (Weadock) was making the one hundred eighty degree turn preparatory to taking off. The regulations referred to and others pertinent read as follows:
"60.3301 (b) A take-off shall not be commenced until there is no risk of collision with other aircraft during such take-off.
* * * * * * *
"60.3303 (d) Aircraft approaching for a landing shall, unless impracticable, maintain a straight approach course for the last 1,000 feet before crossing the airport boundary. * * *
"60.3404 (e) Landing. An aircraft landing in the manner prescribed in § 60.3303 (d) shall have right-of-way over other aircraft in flight or on the ground or water, except aircraft landing in distress.
"60.3405 (f) Distress Landing: An aircraft in distress shall have right-of-way in attempting to land."
Weadock admitted that these regulations were known to him; that he had learned their contents as a student but excuses his *Page 141 
nonobservance of them on the ground that he did not know the Greer plane was in flight and after exercising usual and customary diligence, did not see it. He testified that had he seen the plane he would not have taken off until it had completed its maneuvers, thereby according to it the right-of-way to which it was entitled under the regulations.
It stands to reason that Weadock did not see the Greer plane. Surely, he would not have wilfully violated the regulations, thereby jeopardizing his own personal safety, incurring certain reprimand or suspension, and, in addition, creating an unfavorable impression regarding his potential qualities as a flier. On the whole, he was a fair witness. For this reason and for others hereinafter assigned, we conclude that he did not see the Greer plane although he exercised the usual and customary effort to inform himself if it were safe for taking off. These conclusions logically prompt consideration of the secondary question: Should Weadock be held to have seen the Greer plane on the legal principle that as regards accidents generally one is presumed to have seen that which it was possible to have seen? Due to the peculiar facts of the case, we do not think so and shall, at length, set out our reasons for this conclusion.
The Piper Cub is a monoplane and is used generally for training purposes. It is of light weight and easy to handle on ground and in air, with tandem seats. In solo flying the pilot occupies the rear seat. This contributes to the plane's equipoise which renders it more stable in flight. This seat is under that portion of the top between the wings. Above it is a rectangular opening in the top about twelve inches by twenty-four inches. While taxiing and flying, the pilot is completely enclosed. In front of him, corresponding to the windshield of an automobile, the opening is panelled with pyralin, a transparent material. Openings on each side are of same material. These side openings afford satisfactory vision horizontally from within, but the wings obstruct vision upward. When grounded or taxiing the front end of the plane is higher than the seats. This, to a material extent, interferes with vision ahead. The opening in the plane's top gives limited opportunity for seeing planes above. It is shown that in so far as concerns visibility from within, the Piper Cub affords as much as any plane, and more than some. On account of limitations upon the ability of the pilot to see planes aloft in either direction, the one hundred eighty degree turn precedent to taking off is important. This turn affords the pilot opportunity, so far as his location, etc., will allow, to scan the air, north, east and south. A witness was questioned as to comparative visibility from the two seats, and answered: "Well, sir, the front seat affords greater visibility, but on the rear seat you have a great deal of visibility. However, it is not as good as that in front."
There is no visibility whatever through the back portion of the plane.
The exact or near exact whereabouts of Greer's plane when Weadock entered his is not fixed by the record; neither is it shown how long Greer had flown over the "spot" in the initial stage of his maneuver when Weadock began to taxi northward. Only two of the several eyewitnesses to the collision and to the movements of the two planes immediately prior testified. Neither side attempted to procure the testimony of Greer or Littlejohn nor of any of the instructors present, save that of Lane, and he did not see Weadock after he taxied off.
Appellees criticize appellants for not using Littlejohn and one Daniel, a Stovall School instructor, as witnesses, and argue that because of their failure to do so, inference should be drawn that their testimony would have been unfavorable to them; but, on the other hand, excuse themselves for not procuring the testimony of these parties for the reason that they knew, as to them, they were hostile. They were in the State of Texas prior to and at date of trial, having long before ceased to be employed at the airport.
As Littlejohn was closely observing Greer's flight he could have given enlightening testimony concerning the pattern he followed, and surely Greer could have done so. The character of Greer's pattern is a hotly controverted question of fact. Appellees contend that he "cut the field" after executing the second one hundred thirty-five degree turn, thereby making it impossible for Weadock to have seen him as he taxied north and unlikely when describing the one hundred eighty degree right turn immediately prior to taking off, whereas appellants contend that Greer followed the usual pattern, one of such delineation as to place him approximately one thousand *Page 142 
feet north of the northern boundary of the airport when he made the ninety degree turn and headed for the "spot".
The airport is approximately 4,500 feet in length, north and south, and is approximately 2,600 feet east and west. It embraces three hundred forty-six acres and is located in a bend of Red River. Its south end touches the river. There are intervening areas between its north and east sides and the river.
Both sides have labored assiduously to prove their respective theories as regards the pattern Greer followed in executing his test maneuver, and have tendered plausible calculations and given persuasive figures in support of their contentions. On account of so many uncertainties, these are inconclusive.
The testimony of the two eyewitnesses to the accident and prior movements of the planes, augmented by that of Weadock, fairly well substantiate plaintiffs' position.
J.G. Morrison, a student trainee, was standing near the northeast corner of the Administration Building when the collision occurred and had casually watched Greer while making his flight. He, himself, had made such a flight several times. He saw the Greer plane when it made each of the three turns and headed toward the "spot". He also saw it "circling around the northern part of the field", presumably between the last one hundred thirty-five degree turn and the ninety degree turn.
L.C. Allen, Jr., also a training student, was in front of the Administration Building and saw the accident. He saw Weadock as he taxied to the point of take-off and when he took off. He gave the following testimony:
"Q. Do you recall what first attracted your attention on this day to this accident? A. Well, sir, we noticed — whether there was going to be actual contact or not it would be close, when one was taking off and another was coming in.
"Q. In other words, when the students or the planes were both in the air an accident was imminent? A. Yes.
"Q. That was what attracted your notice and made you pay attention to what was going on? A. Yes.
* * * * * * *
"Q. Did he proceed in a normal manner in taxiing and turning on that occasion? A. Everything was normal up to the point, yes.
"Q. Everything was normal, just like he had been instructed to do? A. Yes, sir.
"Q. Do you remember about where in the air the Greer plane was when the Weadock plane was about making its turn? A. Yes, sir. Approximately the northeast end of the field.
"Q. Northeast end of the field? A. Yes, sir.
"Q. Then with the Weadock plane facing due north just before making this turn, the Greer plane would then be directly to his right or almost directly to his right? A. Almost directly to his right."
Weadock was asked why he did not see the Greer plane when he turned to face south, and answered: "Greer's plane was cutting the field from the east."
Following this answer, he also testified:
"Q. Where did that put his plane in relation to the wing of your plane? A. Greer was coming down and the right wing of my plane obscured my view in seeing him."
Weadock says that before making the one hundred eighty degree turn he stopped his plane and closely observed air conditions north of him because, as the wind was from the south, incoming planes would be expected to approach the field against the wind. As he did not see the other plane when he looked toward the north, but now knows it was then in flight, he concludes it was cutting the east part of the field or else it would not have overtaken him when and where it did.
This is a rational conclusion. Greer was traveling at approximately eigthy-five miles per hour or one hundred twenty-four feet per second. Only eight seconds were required for him to go one thousand feet. Evidently this much time was consumed by Weadock in making the turns and in pausing immediately before taking off. His plane traveled at about forty-seven miles per hour or sixty-nine feet per second, slightly more than one-half the rate of Greer's. He had come one thousand four hundred feet when the accident occurred. Therefore, it appears fairly clear that had Greer been north of Weadock, even one thousand feet north of the northern boundary of the field, he would have passed over him by the time he took off or within a second or two thereafter.
It is well here to reiterate that Greer was not making a normal flight. He was simulating *Page 143 
a plane in distress and was not required to observe the regular order of things in executing the maneuver.
It was not imperative of Greer that he describe a pattern of such proportions as would place him one thousand feet above the northern boundary of the field when he made the last or ninety degree turn. Regulation 60.3303 (d) of the CAA, quoted above, applies to planes intending to make normal landings.
Therefore, Weadock could not at any time have seen Greer north of him because when he looked in that direction, Greer was not there to be seen, and after he, Weadock, turned east and south, of course, he could see nothing north of him. The only opportunity he had to see the other plane was as he made the two ninety degree turns before taking off. After he faced south the left wing completely obscured his visibility east as to objects several hundred feet above him. In view of his location in the plane and limited visibility forward and to each side as he made the turns, it is not surprising that he failed to see Greer's plane. His failure to have done so, in our opinion, should not convict him of negligence on that score. He might not have been as vigilant as an experienced flier would have been, but it must be remembered his experience was limited and he assumed from not having been informed to the contrary, that conditions were favorable for a take-off. In addition, the north, from which direction incoming planes would be expected, was clear when he turned to take off.
It is argued by defendants' resourceful counsel that even though it be found and held that Badgett was negligent in any manner or to any extent, the intervening negligence of Greer severed the chain of causation and that as his negligence was the proximate cause of the collision, Badgett is absolved from liability. In view of the character of flight Greer was making, we do not think the pattern he followed in doing so convicts him of negligence of any sort.
The Administrator of Civil Aeronautics filed complaint with the Civil Aeronautics Board alleging that Raymond L. Weadock, who held a student's pilot certificate, had violated certain civil air regulations, and requested that the Board initiate appropriate proceedings to determine whether or not the certificate should be revoked or suspended. On March 11, 1941, nearly four months after the accident, the Board issued its order to Weadock to show cause why his certificate should not be revoked or suspended, because he took off from the Shreveport, Louisiana, airport: "* * * when there was risk of collision with other aircraft and without giving right-of-way to a landing aircraft, in violation of sections 60.330, 60.3301 (b) and 60.3404 (e) of the Civil Air Regulations."
A hearing was fixed for and had on April 8, 1941, at which Weadock and his counsel were present. Testimony of several witnesses was adduced, but none on Weadock's behalf. The Board sustained the charges and suspended Weadock's pilot certificate for one hundred twenty days, giving written reasons therefor. Defendants herein offered and tendered for filing in evidence a copy of the opinion and order of suspension, certified according to Act of Congress, specially applicable thereto. On objection of plaintiffs' counsel, the offering was disallowed. Defendants excepted to the ruling and here complain that the same was erroneous. We are unable to agree with this contention, but, on the contrary, are of the opinion that the ruling was correct, with this qualification: That the documents were admissible to prove that the charges were made and the result of the trial. Weadock, over objection of his counsel, was allowed to be interrogated on this subject. He frankly admitted that such charges were preferred against him and that he was adjudged guilty of infracting the regulations and was suspended.
The analysis of the testimony adduced and intermediate findings of the Board were not admissible for several reasons. The tendered documents did not constitute the entire record, and the findings did not have the effect of res judicata because, if for no other reason, the demand in this suit (cause of action) and that in the charges are unlike, and the parties to the two proceedings are not the same.
The physical injuries sustained by Weadock were of a most serious character, but were confined to the face and mouth. The face was mashed in, particularly the right side and the nose. His attending nurse described his injuries in this way: "His face was mashed as if you had mashed a potato or dropped an egg and broken it."
His condition was such that the doctors at first were doubtful he would survive. Brain concussion produced unconsciousness *Page 144 
for eighteen days which was followed by twelve days of semi-consciousness. There was also contusion of the brain, which means that it was bruised. He remained in the sanitarium until December 24th and was then taken to his parents' home. For five weeks food was given intravenously and thereafter, for six months, food was ground in order for him to swallow it. There was a five inch laceration over the right eye running into the hair; a lip was incised; the bony socket of the right eye was fractured and pushed backward; the lower right jaw was fractured, and many of the teeth were loosened. The impact was so violent that the respective positions of the upper and lower front teeth were reversed; that is, the lower teeth now extend beyond the upper in biting, whereas normally, the reverse is true. The right cheek bone was crushed and depressed. Diplopia (double vision) resulted from paralysis of the right superior rectus muscle. This condition may not be relieved by the use of glasses; an operation will do so. While in the sanitarium edema, swelling of the spinal cord, developed and for a time it appeared that fatal results would ensue. Punctures of the spine revealed bright blood therein, a certain sign of brain bruising.
In November, 1941, nearly one year subsequent to the accident, young Weadock's father, out of a desire to learn if his physical condition could be materially improved, sought what is conceded to be equal to the best medical and surgical advice in the country. He first carried the boy to Mayo Brothers Clinic in Rochester, Minnesota, but was given scant encouragement there. He then carried him to Dr. Vilray P. Blair, eminent surgeon, plastic and otherwise, in St. Louis, Missouri. Dr. Blair made a close physical examination of the young man and had like examination made by an oculist and also an otolaryngologist (ear, nose and throat specialist). Dr. Blair's findings follow: "The lower borders of the orbits are back, but X-rays do not show where the break is; must be deep in the orbit and at the junction of the zygomatic bone, but I can feel no roughness or sign of fracture on either side. Whole upper jaw has been pushed backward, including the borders of the orbits and front of the maxilla. On the left side the first bicuspid below occludes in front of the cuspid above; on the right the upper bicuspid occupies a palate position in relation to the first bicuspid. Has had a fracture of the lower jaw which has apparently united but has left a space between the first lower bicuspid and lateral on the left side; union is good but incisor teeth are sore and loose. There has been a transverse cut at the junction of the lower lip and chin which went all the way across; on the right it came up to the vermilion; on the left it came to within two cm. of the vermilion. Shape of lip is good but the skin adjustment is not good. The bridge of the nose has been pushed back. He has double vision."
Dr. Blair stated that these deformities could, in a large measure, be corrected by a series of operations, described by him as follows: "Advance the upper lip, cheeks and columella on the septum and maxilla. Implant cartilage to the front of the cheeks to fill them out, also to the dorsum of the nose. Later remove the upper anterior teeth from and including the left upper lateral back to the first right upper molar, and substitute a plate with a flange that will hold the lip forward in its proper position. Open and resuture scar of lower lip and chin. Removal of the anterior lower teeth which are loose and tender, and get the area cleaned up before starting the repair work. This will not reposition the displaced upper jaw but should give an acceptable cosmetic and functional restoration."
He added that the main permanent derangement is the upper jaw which will "remain back, being compensated for by the moving forward of the lip and columella, and wearing of dentures which will bring the teeth into proper occlusion." He also said that "the backward position of the bridge of the nose can be improved by inserting a piece of costal cartilage." The cost of the surgical work needful to accomplish the results Dr. Blair enumerated, he said, would be $5,000. That amount does not include the cost of dental surgery from time to time, at Shreveport, in conjunction with Dr. Blair's various operations. This will amount to $630, which includes cost of removing four lower and seven upper teeth, temporary and permanent casts, plus incidental surgical work. Two teeth were removed before seeing Dr. Blair.
Young Weadock sued for $7,000 to cover estimated costs of plastic and dental surgery; also for $452, being amount of expenses and bills incurred for treatment and examination of his injuries since attaining majority. He purposes to submit to the surgical operations necessary to restore, *Page 145 
as far as science can accomplish, his former splendid appearance and physical condition.
Photographs in the record reflect young Weadock's facial appearance prior to and since he was injured. Before the accident he was vigorous physically and mentally, and handsome. The accident changed all this. His face with its right side still depressed, ugly scar below the lower lip, and dark covering over one eye to neutralize the diplopia, is the antithesis of what it was before the injury. Surgical science will improve but cannot fully restore conditions as they were; especially is this true of the mouth after so many of the teeth have been removed. Artificial substitutes, while splendid as such, cannot match the genuine and are constant and unpleasant reminders of happenings one would naturally wish to forget.
Weadock was able to be up and about in January, approximately two months after the accident. He lost some thirty pounds but recovered physical strength at a normal rate after being able to walk about. For six months prior to trial, in May, 1942, he was able to drive an automobile with vision of one eye obscured.
Naturally, Weadock suffered extensive mental up-set from the effect of the impact of the plane with the ground. We are satisfied from testimony bearing thereon that at date of trial he had not fully regained lost ground in this respect. Whether his mentality will ever again be as bright and active and as well balanced as it was prior to the injuries, the physicians would not venture an opinion. Time alone will reveal whether there will be further improvement in this connection, and if so, to what extent.
To the time of trial, nature, plus competent medical attention, had wrought much improvement both mentally and physically. The parents and intimate friends of young Weadock testified that in contrast to a bright, congenial disposition prior to the accident, he had become morose, nontalkative and despondent, evincing little or no interest in his surroundings, lisping when he speaks, accumulating excessive saliva when he tries to talk, and cannot read very long at the time. As a student at Centenary College and while training at the airport, he rated well.
It is not surprising that this young man, afflicted as he is, physically and mentally, with life's ambitions dashed to pieces, and the ultimate results of contemplated surgical operations not certain, should be despondent, morose, and in other respects, unlike his former self.
No amount of money can fully compensate for the injuries, pain, suffering, etc., this young man has experienced and will experience, to say nothing of consequent impairment. However, we think the award of the jury excessive to a material extent. He is entitled to recover the amounts that will be required to defray the expenses of plastic surgical and incidental operations. These amount to $5,630; also for expenses, etc., incurred since attaining majority, or $452. For pain, suffering, shock, impairment, both physically and mentally, we think an award of $30,000 adequate. These amounts aggregate $36,082, which is $6,870 less than the jury's award.
There is no contest over the amount due Leo H. Weadock.
As is true in all cases involving claims for damages based upon serious physical and other injuries, determining adequate quantum becomes a difficult question. Courts endeavor to maintain a standard of uniformity, but this is not easy of accomplishment. Awards by the courts of this state in personal injury cases, generally, are far below those of many of the courts of our sister states; especially those of Texas and Mississippi. We here give the cases wherein the largest amounts have been awarded in this state, without narrating the facts thereof, to-wit: Hamilton v. Lee, La.App., 144 So. 249, $15,000; Meares v. Dixie Creameries, Inc., 9 La.App. 213, 120 So. 133, $12,000; Rigby v. Ætna Casualty Surety Co. et al., La.App., 151 So. 119, $15,000; Babin v. Sewerage Water Board of New Orleans, 2 La.App. 517, $25,000 (in addition to $5,050 paid him as workmen's compensation); Hamilton v. Louisiana Railway Navigation. Co.,147 La. 616, 85 So. 611, $15,000.
In the case of Huggins v. Atlantic Coast Line Railway Company,96 S.C. 267, 79 S.E. 406, the Supreme Court of South Carolina awarded $40,000 to an engineer thirty-five years old, earning $150 to $200 per month, for permanent disability.
In the case at bar, in addition to feeling that the character of the injuries and duration of impairments, with other pertinent factors, justify the award, there are two other reasons which generously fortify us in this respect. *Page 146 
It is well recognized that courts will, and have the right to take into consideration in assessing damages in tort actions, the ability of the defendant or defendants to pay. Here we have sixteen solvent surety companies as defendants, one of whom is responsible for one-sixth of the judgment, while responsibility of the others ranges from one-twelfth to one-twenty-first.
Also, the decreased purchasing power of the American dollar, with little or no prospect for any change, except probably further decrease, for many years, is a pertinent factor to be taken into consideration in determining the award. See Scott v. Claiborne Electric Cooperative, Inc., 13 So.2d 524, decided by this court on March 31, 1943.
For the reasons herein assigned, the judgment in favor of Leo H. Weadock is affirmed and the judgment in favor of Raymond L. Weadock is amended by reducing the amount thereof to $36,082, and as thus amended, said judgment is affirmed with costs.