Plaintiff has filed this suit in which he is seeking to recover damages for personal injuries as a result of an automobile collision between an Austin automobile in which he was a guest passenger, and a truck-trailer being driven by the defendant Ulysee Landry and owned by Leo Cafiero, Inc., and which collision occurred about one mile north of Napoleonville, Louisiana, on Louisiana Highway 29 at about 9:30 P.M. on June 8, 1946, near a road house known as "Nicky's Place." Also sued is the insurer of the Cafiero truck, the Maryland Casualty Company.
The Austin automobile was being driven by Alcee J. Gautreaux, who was killed instantly in the collision. His mother, Mrs. Alcee J. Gautreaux, has filed suit against the same defendants in which she seeks to recover $23,350 for loss of love, companionship and affection, future support, funeral expenses and the value of the Austin car which was destroyed. Both cases were consolidated for the purpose of trial and separate judgments rendered.
In the instant case, while the plaintiff alleges in his petition nine separate and distinct acts of negligence on the part of Ulysee Landry, driver of the truck, as the proximate cause of the accident, as well as seven separate and distinct violations of the State Highway Regulatory Act of 1938 as amended, Act No. 286 of 1938, as amended, which acts of negligence were denied by the defendant in its answer, and in which the defendants also charge in the alternative that Alcee Gautreaux, the driver of the Austin, and George F. Oncale, plaintiff herein, were guilty of negligence and carelessness proximately causing or contributing to the accident by certain acts of commission and omission, the case narrows down to a single question of fact. The plaintiff contends that the truck, when within about fifty feet of the Austin suddenly swerved over into the Austin automobile's proper lane of traffic, striking the Austin and demolishing same. The defendants contend that the Austin swerved into the truck's proper lane of traffic and struck the truck.
Plaintiff, in his petition, itemized his damages which, he alleges, total $55,500, as follows:
1. Being rendered unconscious for a period of five days ..... $ 1,000.00 2. Fracture of the skull ........... 5,000.00 3. Fracture of the roof of the mouth ......................... 1,500.00 4. Fracture of the bones of the right side of the face ........ 2,500.00 5. Lacerations of the right forehead ...................... 250.00 6. Contusions of the chest ......... 250.00 7. Pain and discomfort while in the New Orleans Army Hospital until July 14, 1946 .......................... 500.00 8. Pain and discomfort while in the Brook General Hospital, from July 14th, 1946 to September 20th, 1946 .. 500.00 9. Severe headaches which have continued to the present time .................. 2,500.00 10. Numbness to the right side of the face and forehead which continues to the present time .................. 1,500.00 11. Pain in the right side of face, right forehead and roof of the mouth which continues to the present time .......................... 1,500.00 12. Loss of vision in right eye for three months after the accident ...................... 1,000.00 *Page 397 
13. Diplopia (double vision) which petitioner's sight returned which continues to the present time, usually when petitioner first wakes up in the morning ....... 2,500.00 14. Permanent disfigurement on account of scar on the right side of forehead, approximately three and one-half inches in length which extends from the outer angle of the eye to the hair line ................. 2,500.00 15. Permanent disfigurement on account of three healed wounds and scars on the right forehead varying from 1 1/2 to 3 inches ........ 1,500.00 16. Permanent disfigurement on account of six visible healed scars on left side of face varying from 1/4 to 2 inches ................... 1,500.00 17. Lacerations and scar 1 1/2 by 1/4 inch, medial surface, right knee and pain and suffering in right knee which continues to the date of the filing of this petition ...................... 2,500.00 18. Permanent depression and disfigurement over the upper part of the right molar bone, resulting in loss of the supportive tissue of the right cheek which gives petitioner a sunken appearance and changes his facial contours, and pain which continues to the present time in connection with the above ................ 3,000.00 19. Loss of four upper teeth and pain in connection therewith ..................... 1,500.00 20. Irregularity of the right frontal bone due to callous formation over this area and extreme tenderness on pressure over this area ....... 1,500.00 21. Scar in the right posterior axillary line due to a brush burn which has healed ......... 500.00 22. Injury at the 4th and 5th ribs anteriorly on the right side of the chest which still causes pain on pressure ...................... 500.00 23. Damage to petitioner's brain due either to a laceration, concussion or contusion of the brain which damage and injury is permanent and according to Dr. Richard L. Buck, employed by the defendant, Maryland Casualty Company "following an accident of this type there is fairly often some pressure which may later on give rather severe symptoms and patient at present complains of rather severe headaches, especially with atmospheric changes. If there should be any pressure due to callous formation, there is always the possibility that patient might develop epilepsy or some other evidence of brain damages or brain pressure," for which petitioner is entitled to the sum of ..... 10,000.00 24. Future pain, sufferings and disability in connection with the above 23 paragraphs, itemizing petitioner's extensive injuries ............ 10,000.00
The case was duly tried and the judge with written reasons rendered judgment in favor of the plaintiff and against the defendant, Ulysee Landry, and the codefendant, Maryland Casualty Company, the insurer of the truck, in the full sum of $23,000 together with legal interest from date of judicial demand until paid, and for all costs including that of the expert medical testimony. From this judgment, the defendants have appealed and the plaintiff, Oncale, has answered the appeal asking that the judgment be affirmed on the merits but the award increased to $35,000. *Page 398 
The facts reveal that the plaintiff George T. Oncale was in the U.S. Army and on the date of the accident, June 8, 1946, was at home on leave, and about 4:30 or 5:00 in the afternoon, he and Alcee Gautreaux, the driver of the Austin, left the latter's home and were going to Napoleonville, and when they got about two miles from Napoleonville the fan belt on the Austin broke and, as they could not obtain one in Napoleonville, they started to Donaldsonville, Louisiana. They got within one-half mile from Donaldsonville where Alcee Gautreaux's brother owned and operated a night club known as "The Shamrock Club" where the plaintiff stated that he and Gautreaux drank two beers, ate supper and sat around and talked to some girls from approximately 7:00 P.M. to 8:45 or 9:00 P.M. They did not go on into the town of Donaldsonville as they found out it would be impossible to obtain a fan belt there. When they left "The Shamrock Club" they intended to go to a dance in Labadieville, Louisiana. Oncale testified it was impossible for them to drive more than fifteen miles per hour due to the fact that they had no fan belt and that the motor would get very hot and it was necessary to stop and cool the motor several times; that they had gotten within one-mile north of the town of Napoleonville at or near the night club known as "Nicky's Place" when he noticed two trucks approaching, and that when the Austin car got within about 30 feet past "Nicky's Place" he saw the second truck and "It just swerved right into us." He testifies that the Austin was being driven by Alcee Gautreaux on the right side of the highway which is the south bound traffic lane; that the truck struck the Austin mainly on the left side. The pictures introduced in evidence show that the Austin car was completely demolished, however, the right front fender seems to be intact from the pictures.
When the collision occurred, the plaintiff Oncale was immediately rendered unconscious and Alcee Gautreaux, the driver of the Austin, instantly killed.
Ulysee Landry, the driver of the truck involved in the accident, was examined under Act 115 of 1934 and testified that he was 47 years of age; that he wore glasses, however, the testimony reveals that there was nothing materially wrong with his eyesight other than the usual effect of his age; that on the day of the accident he was employed by Leo Cafiero, Inc., as a truck driver and had been engaged in this occupation for twenty-eight years. On the date of the accident, Leo Cafiero, Inc., sent two of its trucks to Jeanerette, Louisiana, to haul a cane derrick back to Donaldsonville. These trucks were driven by Ulysee Landry, one of the defendants herein, and by Clarence Joseph, who also testified in the case. At the time of the accident the truck involved in the accident was approximately fifty to one hundred feet behind the lead truck being driven by Clarence Joseph. While Oncale estimates the speed of the trucks at 40 to 45 miles per hour, the drivers of the trucks, Landry and Joseph, testified that they were going from fifteen to twenty miles per hour.
Ulysee Landry, the driver of the truck, testified that at the time of the accident his truck was on its right side of the highway proceeding north toward Donaldsonville, and that after the accident the Austin was a little over the black center line, "heading on my truck" and that it was necessary to pull the Austin loose from the truck. He further testified that his truck was on its proper side of the road after the accident and that his truck was damaged on the left side, mainly to the front fender, bumper, front spring and steering rod. This witness also testified that he stepped on his brakes "at the crash of the two machines." Clarence Joseph, the driver of the leading truck, also heard the crash, which would lead us to believe that the two trucks were rather close together at the time of the accident. There was some testimony that the driver of the lead truck, just prior to the accident, had stepped on his brakes as Ulysee Landry saw the red lights come on on this truck, and also testimony by Landry to the effect that Clarence Joseph had stated to him after the accident that a car had pulled out into the highway in front of him, however this is denied by Clarence Joseph and there is no testimony that any car pulled out into the highway. There is no definite reason proven as to why the truck would suddenly swerve to its left and *Page 399 
run into the Austin. There are many witnesses who testified that they saw skid marks on the pavement at the scene of the accident, varying in length from fifteen feet to one hundred eight feet. All of these witnesses testified that the skid marks that they saw began to the left of the center line of the highway facing north and continued up the highway, some testified to where the truck was stopped, and others in the direction that the truck was stopped. Some of the witnesses positively identified these skid marks as traceable right to the truck involved in the accident.
The witnesses in the case estimated the distance between the Austin and the truck, where they came to rest after the accident, from 15 feet from the rear end of the trailer part of the truck to the Austin, up to 150 feet from the front part of the truck to the Austin. One witness, Sheriff Richard, estimated the length of the truck and trailer to be around 80 feet. Both vehicles after the accident were on the left hand side of the highway looking north, which would be the right side for the Austin automobile but the wrong side for the truck. The evidence further shows that on the night in question, cars were parked all around this night club and on the shoulders on both sides of the highway. While both drivers of the two trucks testified that after the accident the truck which Landry was driving was on its proper side of the highway, and that the Austin had to be pulled loose from the truck, there is positive testimony from witnesses who rushed out of the night club at the sound of the crash that the Austin and truck involved in the accident came to rest as above stated, and testified positively that the Austin was not fastened on the truck, nor was it necessary to pull the Austin away from the truck. Dennis Earl Diaz testified that he was in "Nicky's Place" that night, had gone there to eat supper and had parked his car on the other side of Cotton's driveway, which is sometimes referred to as Harvey Blanchard's driveway, about 12 feet off of the concrete highway, and that he heard the crash of the impact and said to his friend, "It might be one of our cars," and when he got out there, "I saw that my car got hit," and that his car had been hit in the back and had run against a tree in front of it and "the wheel was broken, the fender was bent, and the taillight was broken," and the damage amounted to $14.25. He testified that the little Austin must have hit his car as it was right in the back of his car. He was asked: "How close from the back," and answered, "About, after it hit my car it run against a tree, about six feet." He also saw the truck up the highway on the same side as the Austin. Therefore, taking this testimony and the testimony of the other witnesses who came out of "Nicky's Place" immediately after the wreck and who testified to the position of the Austin and truck at that time, it completely disproves the statement of the truck drivers that the Austin was fastened on the truck and that the truck came to a stop after the accident on its right side of the highway.
The Sheriff of the Parish, Mr. Fernand Richard, testified that he went to the scene of the accident a very short while after it happened and that the truck and the Austin were "100 and some feet apart;" that he observed skid marks on the pavement which "started a little before they got to the Austin until where the truck was stopped, about a 15 degree angle," and "ended at the truck wheels." He further testified that these skid marks began on the left side which is the south bound or west traffic lane of the highway. The Sheriff testified that he had a conversation with Ulysee Landry, one of the defendants and the driver of the truck and that when he talked to Landry, Clarence Joseph, the driver of the other truck was also sitting on the running board with Landry, and Landry at that time said "he went blind" and "he don't know what happened, he was blinded." He also testified that Landry told him that the truck had not been moved at the time he got there. The Sheriff tried to obtain more details of the accident but that is all that Landry said.
The defendants also offered the testimony of Mr. Minor J. Waguespack, who was a trooper with the Department of State Police on the date of the accident and who arrived at the scene at approximately 10:15 or 10:20 P.M. At the time that he arrived there, however, the truck had been moved. He testified, "I couldn't *Page 400 
find any marks or the direct point of contact, and after being told that the vehicles had been moved, I didn't look for any more then, because after the vehicles had been moved I couldn't establish which vehicle had caused the marks. All the cars were going in and out and they would all apply their brakes."
In the report of this accident made by Trooper Waguespack, he stated:
"Indications are that the Austin car pulled to the left to pull into Nicky's Place and seeing he couldn't make it, pulled to the right and could not pull out of the truck's way."
There are no witnesses who testified that this was the case, and Mr. Waguespack himself testified that he only talked to the truck driver, Ulysee Landry, and from this conversation he concluded that this was what happened. There being not one word of testimony or facts in the record to show that the Austin turned in toward Nicky's, this portion of the report would have no probative value. Further, we have an absolute denial by the plaintiff, Oncale, that they intended to go to Nicky's. He positively testified that they were going straight on to a night club at Labadieville, which was only ten miles from Nicky's Club.
Counsel for defendants, in their brief, contend "that the judgments of the Trial Court were manifestly in error and should be overruled by this Court for the reason, first, that neither of the plaintiffs sustained the burden of proving his case, and, second, (alternatively), if the defendant be liable to either plaintiff which is denied, the quantum of damages granted is grossly in excess of that due."
Taking into consideration the testimony of Landry that he applied his brakes at the moment of impact, and the testimony of the various witnesses who testified as to skid marks, apparently made by the truck, that they began to the left of the center line of the highway looking in a northerly direction, which would be in the west lane of traffic, the proper lane of travel for the Austin, and the testimony of the two truck drivers that the two vehicles were fastened together and had to be pulled loose, which is amply proven not to be true and which could not be true as the Austin car proceeded on across the highway and struck another car before coming to rest, we can see no manifest error from the testimony in this case in the judgment or reasoning on the question of liability.
The record reveals that as a result of the accident on June 8th, 1946 the plaintiff Oncale was taken to the New Orleans Bomber Base Hospital where he remained unconscious from five to eight days. He stayed in this hospital approximately six weeks before being moved to the Brooks General Hospital in San Antonio where he remained approximately nine weeks more. He testified that he received a fractured skull, a right eye injury so that he could not see for three and one-half months, that at the date of the trial his right eye was lower than his left; also a fractured palate, fractured cheek bone, four teeth knocked out, his knee was cut and still pained him, two ribs broken, and he still complained, on the date of the trial, of pains in his chest, and that he had cuts on both sides of his face. He testified that as a result of the accident he had diplopia (double vision) in his right eye, severe headaches constantly and he suffers pain when he eats as a result of the fracture of the roof of his mouth, and that he had lost the ability to smile due to a nerve injury and resulting muscular weakness; that one side of his face is numb, that the pain was extreme and that it was necessary during the entire time he was in the hospital to be relieved with opiates. He also testified he was on a liquid diet for four months and that at the time of the accident he weighed 190 pounds and after the accident he lost fifty pounds, however, on the date of the trial, approximately two years after the accident, plaintiff weighed 180 pounds. Plaintiff was operated on twice, the last time in the Army Hospital in Panama where he was confined and remained in the hospital for approximately fifty days at that time. Plaintiff testified that this operation was necessary as he "had some bones and a tooth that was mashed in there and infected my sinuses," which was attributable to his accident. Plaintiff also, *Page 401 
on the date of the trial, testified that he could not sleep on his side due to pain but that if he slept on his back he didn't suffer any pain.
Dr. Shirley Lyons testified as follows:
"Q. And what did you find in connection with the first office visit for examination? A. May I just read my findings here? That's about all I have to go on.
"Q. Yes, sir. A. Old lacerated wound of the right upper palate, four upper teeth on the right missing and replaced by a bridge; three lacerated wounds of the right forehead, one and a half to three inches in length; six visible scars on the left side of the face running from one quarter of an inch to two inches; two lacerated wounds on the right side of the face; right axilla, a depressed scar one inch by three quarters of an inch; there was clinical evidence of an old fracture of the right frontal malar bone. He complained of marked tenderness of the right frontal region and of the right face on examination. There was a depression of the upper part of the right malar bone, resulting in the loss of support of the right face, giving the patient a sunken appearance and changing his facial contour. The patient complained of double vision, severe headache and an anesthesia of the right upper lip. General examination otherwise was normal.
"Q. What was your conclusion, Doctor? A. Patient had received severe injuries as described above with resulting permanent scars and deformities described and a neurological examination recommended.
"Q. Who did you recommend for a neurological examination, doctor? A. Dr. Anderson or Dr. Carr.
"Q. Both of these are outstanding gentlemen in their profession, I suppose? A. Yes, sir, they are.
"Q. Doctor, the plaintiff gives a history of having been rendered unconscious for a period of five or possibly eight days. Would this prolonged period of unconsciousness indicate to you a serious injury? A. It would.
"Q. What sort of injury would it indicate to you, as an expert witness? A. Well, it would indicate severe injury to his brain and probably a fractured skull. Of course, we know from his clinical examination he had a fracture of the malar bone and frontal bone.
"Q. What fracture of the skull did he have, Doctor? A. I wouldn't have that except from Dr. Anderson's interpretation from his own history.
"Q. There was definitely a fracture of the roof of the mouth that you could determine? A. Fracture of the roof of the mouth and the malar bone and fracture across the frontal bone. All that would indicate that he had a fracture, probably at the base of the skull. I don't have any way of confirming that by my examination without examination of his hospital record."
Dr. Lyons further testified that at the time of his examination a period of two years had passed from the date of the accident and it was his opinion that the plaintiff would probably suffer pain permanently. There was no doubt in Dr. Lyon's mind but that the plaintiff genuinely suffered pain as a result of his injuries and, in fact, all of the doctors were of the opinion that the plaintiff was intelligent and conscientious, with the exception of Dr. Buck who thought possibly he was over-emphasizing his pains.
Dr. Gilbert C. Anderson, nerve specialist, who also testified on behalf of the plaintiff that the pain which plaintiff complained of in the right side of the face, accompanied by numbness and abnormal sensations when touched was genuine, and also the complaint by plaintiff about the roof of his mouth being very painful at the site of a fracture in the hard palate was also true. Dr. Anderson was asked to sum up his neurological findings in the case and he testified as follows:
"Q. Would you be good enough to sum up for us, if you please, your neurological findings in this case? A. Yes, sir, I'll be glad to. I thought that there was some muscular weakness of the side of the face and that that might be due to a brain injury. The numbness and the pain in his face and the paresthesia of which he complained, and by that I mean the tingling, *Page 402 
needles and pins sensation or electric shock that he said he felt when his face was touched. Those things I thought would probably be more likely associated with an injury to the fifth nerve in connection with the fracture that he had of the malar bone, and the pain of which he complained on upward gaze, I also thought was probably associated with that fracture or with scars as a result of that fracture, rather than to a brain injury. The soreness and pain that he had in his mouth, I would not consider particularly a neurological question and neither would I consider the fit or the comforts of his denture. I believe that the eye and the face probably constituted the abnormal neurological findings.
"Q. When you speak of "neurological findings", you mean brain findings? A. The nervous system, without particular reference to the tractus of bones and deformities or things of that sort.
"Q. Did you attribute the muscular weakness of the face being limited to the lower portions, did that suggest that it might be of accidental origin and due to a brain injury? A. Yes, I just mentioned that in my previous reply.
"Q. Yes, sir. Doctor, after this length of time, could you prophesy how long the brain injury might last, considering that nearly two years have elapsed since the date of the accident? A. Well, in a healthy vigorous young man of twenty-three, usually the maximum amount of recovery would be expected by this time.
"Q. Well, has he recovered, Doctor? A. Well, he still has that weakness there.
"Q. You mean that brain weakness? A. Muscle weakness that I think may be due to the central lesion or brain condition.
"Q. Would it be reasonable to say at this time it would be very difficult to prophesy how long these will persist, inasmuch as they have shown practically no improvement after nearly two years?
"Mr. Brooks: I object to that as an assumption of a fact not proven.
"Q. You may proceed, doctor. A. I think it will probably be permanent after that length of time but you can't be sure of that."
"Q. Now, you described the type of examination that you made and went into some detail with reference to the twelve cranial nerves. Did you find all of those nerves normal? A. There were abnormalities in connection with the third — probably the third and the fifth and the seventh.
"Q. What were the abnormalities with reference to the third? A. That would be with reference to the diplopia, the double vision of which he complained and that is probably through one of the muscles supplied by the third nerve but not necessarily due to the nerve itself."
"Q. With reference to the fifth cranial nerve, I believe you stated there was some abnormality present? A. Yes, sir.
"Q. What was that? A. That nerve that supplies the sensation to the side of face and part of the scalp. What he complained of was numbness in the side of the face.
"Q. Did you establish that? A. I established that by the usual methods of examination, which again is subjective. You ask the patient if he can feel it and he says yes or he says no.
"Q. So when he said he could not feel it, you assumed that he could not feel it? A. That's about as well as you can do in that kind of examination.
"Q. That's the only abnormality you found then? A. Well, in reference to the fifth cranial nerve, he complained of these electric like spreadings of sensation when you tap him or touch his face.
"Q. Did you establish that? A. Just the same way.
"Q. By subjective symptoms only? A. I tried it and he said he felt it.
"Q. Now, what about the seventh cranial nerve? A. That was where I saw a slight weakness of the right side of the face.
"Q. You saw that yourself? A. I saw that myself; that was objective.
"Q. That was slight you said? A. Yes, sir.
"Q. You think that's temporary? A. No, sir. *Page 403 
"Q. What is the cause of that? A. I don't know but I thought that might be due to his head injury — to his brain damage."
Dr. Richard Buck who testified on behalf of the defendants, found the same injuries as Doctors Lyons, Anderson and Bahn. He testified that the patient showed evidence of very severe traumatic injury which consisted of a fracture of the right frontal bone, fracture of the right maxillary bones extending through the roof of the mouth, and that there was some deformity of the face, due to the accident, however, it was not marked nor disfiguring. There was a difference in the level of plaintiff's eyes, however, it was not noticed by Dr. Buck nor by Dr. Anderson. Dr. Buck was of the opinion that plaintiff was endeavoring to impress him with the severity of all of his symptoms. He did not doubt that he suffered headaches and some tenderness in the areas of the fractures of the upper lip but merely did not believe that they were as severe as plaintiff wished him to believe. He thought that plaintiff would reach maximum improvement in four years, whereas Doctors Anderson, Lyons and Bahn were of the opinion that plaintiff had already reached the maximum improvement.
Dr. Charles A. Bahn, prominent ophthalmologist, testified on behalf of the plaintiff. He found that the diplopia or double vision was permanent. He testified as follows:
"Q. What was your diagnosis of the right eye? A. The right eye showed a presis of the inferior oblique muscle which corresponds with the fracture shown apparently in the x-rays which were made on this patient. The second diagnosis was a right facial anaesthesis, that is, numbness which is due to injury of the fifth nerve. The third diagnosis was a right facial muscular weakness, that is, his mouth was drawn to the side and his eyes did not quite close so well due to a seventh nerve injury.
"Q. You said that the right facial anaesthesia was due to a fifth nerve injury? A. That's right.
"Q. What was your prognosis in this case? A. The fact that a year and a half had gone by since the injury, meant that any change which occurred would probably be for the worse, meaning that normal healing had completely taken place and that as we get older, obviously these sick parts wear out faster with age than normal structural and functional parts.
"Q. Do you mean by this, Doctor, that if this young gentleman had never had an accident, there wouldn't be as much deterioration in the future as you anticipate there will be because of this accident? A. The deterioration, of course, in a case of this sort is, one might say, potential. It is impossible to know exactly how much will occur in say ten or twenty years but we do know that parts which are defective, structurally or functionally, are much more prone to the degenerative changes of age.
"Q. Do you mean by that that these degenerative changes with age are more likely to occur quicker or faster with a young man who has had such an injury than they would with one who had not had such an injury? A. Exactly. These changes are more likely to occur earlier and also to be more severe if they do occur.
"Q. Doctor, what have you got to say with reference to the fracture of the malar bone involving the floor of the orbit? A. This fracture of the malar bone which is, of course, the cheek bone, especially prominent in Indians, involving the floor of the orbit, that is, the boney box in which the eye is located. This accounts for the lowering of the right eye and also for the limitation of movement caused by a paralysis or injury to the inferior oblique muscle which is located at this point.
"Q. Was that responsible for the inferior oblique muscular weakness? A. Yes, sir.
"Q. Is there any doubt in your mind about the double vision? A. No, there is none.
"Q. Is there any doubt in your mind about the facial numbness? A. No, there is none.
"Q. Is there any doubt in your mind about the facial muscular weakness being directly due and attributable to the injury? *Page 404 
A. No, I am sure that those all exist and that they are almost unquestionably due to exactly such an injury as this man describes having had."
He further testified that glasses would have no effect whatever on plaintiff's double vision; that it was permanent and would not improve and that he would not pass him for Military Duty. Plaintiff had re-enlisted in the Military Service prior to his accident and injury and it is therefore probable that should it be necessary for plaintiff to subject himself to another physical examination in order to remain in the Army or to re-enlist that he would be rejected on account of his physical impairments. Dr. Bahn was also of the opinion that plaintiff "is taking risks with his eyes and the time will probably come when his double vision will cause injury to himself or someone else especially in a military capacity." Under the facts it would probably be difficult, if not impossible, for the plaintiff to pass a physical examination for industrial work.
From the testimony, there is no doubt that plaintiff has suffered severe and disfiguring injuries resulting in a permanent injury to the sight in his right eye, permanent nerve and muscular injuries, a brain injury which, while not probable, could possibly result in epilepsy, and as a result of the accident he suffered excruciating pain which entitles him to a substantial award as damages.
Counsel for plaintiff strenuously argues that plaintiff is entitled to damages comparable to those received by the plaintiff in the case of Weadock v. Eagle Indemnity Co., La. App., 15 So.2d 132, 143. In that case the Court found plaintiff's injuries to be:
"The physical injuries sustained by Weadock were of a most serious character, but were confined to the face and mouth. The face was mashed in, particularly the right side and the nose. His attending nurse described his injuries in this way: 'His face was mashed as if you had mashed a potato or dropped an egg and broken it.'
"His condition was such that the doctors at first were doubtful he would survive. Brain concussion produced unconsciousness for eighteen days which was followed by twelve days of semi-consciousness. There was also contusion of the brain, which means that it was bruised. He remained in the sanitarium until December 24th and was then taken to his parents' home. For five weeks food was given intravenously and thereafter, for six months, food was ground in order for him to swallow it. There was a five inch laceration over the right eye running into the hair; a lip was incised; the bony socket of the right eye was fractured and pushed backward; the lower right jaw was fractured, and many of the teeth were loosened. The impact was so violent that the respective positions of the upper and lower front teeth were reversed; that is, the lower teeth now extend beyond the upper in biting, whereas normally, the reverse is true. The right cheek bone was crushed and depressed. Diplopia (double vision) resulted from paralysis of the right superior rectus muscle. This condition may not be relieved by the use of glasses; an operation will do so. While in the sanitarium edema, swelling of the spinal cord, developed and for a time it appeared that fatal results would ensue. Punctures of the spine revealed bright blood therein, a certain sign of brain bruising."
Also, in this case, the plaintiff was taken to Mayo Brothers Clinic at Rochester, Minnesota to learn if his physical condition could be materially improved but was given scant encouragement there. He was then taken to an emminent surgeon, plastic and otherwise, in St. Louis, Missouri, and after a careful physical examination as well as an examination by an oculist and also an otolaryngologist (ear, nose and throat specialist), they found that the cost to attempt to repair his face would be approximately $5,000, which did not include an estimate of $630 for "removing four lower and seven upper teeth, temporary and permanent casts, plus incidental surgical work." Even after this extensive plastic surgery, the doctors stated: "This will not reposition the displaced upper jaw but should give an acceptable cosmetic and functional restoration." Photographs of young Weadock prior to and since his injuries revealed a shocking difference. In *Page 405 
assessing damages in this case, the Court took into consideration the ability of the defendants to pay and found that there were sixteen solvent surety companies as defendants, and the Court further stated that the decreased purchasing power of the American dollar was a pertinent factor to be taken into consideration in determining the award.
We do not think that plaintiff's permanent injuries in the case at bar are comparable to those of young Weadock. In view of the extensive physical injuries which were sustained by the plaintiff as a result of the accident and the excruciating pain and suffering which he underwent and the permanent disfigurement to his face and sight in his right eye, we are of the opinion that he is entitled to an award of $17,500 for said injuries, pain and suffering.
It is, therefore, ordered that there be judgment in favor of the plaintiff, George T. Oncale, and against the defendants, Ulysee Landry and Maryland Casualty Company, insolido, in the amount of $17,500 together with legal interest from date of judicial demand until paid and for all costs, including that for the expert medical testimony.
As thus amended, it is ordered that the judgment of the District Court be affirmed.